# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **PATRICIA A. WILSON,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-cv-00157-KOB** |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY**, | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 8, 2010, the claimant, Patricia A. Wilson, protectively filed a Title II application for a period of disability and disability insurance benefits. She initially alleged onset of her disability beginning February 15, 2008, a date that she later amended to August 1, 2009. The Social Security Administration denied all of her claims on October 14, 2010. The claimant then filed a written request for a hearing before an Administrative Law Judge on December 2, 2010. The ALJ held a video conference hearing on May 22, 2012.

In a decision dated August 2, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for disability benefits. (R. 21). The Appeals Council then denied the claimant's request for review and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3). For the reasons stated below, this court will AFFIRM the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant argues that the Commissioner erred in two ways. First, the claimant alleges that the Commissioner's decision should be reversed because the ALJ failed to discuss the claimant's obesity and right ankle arthritis in developing her RFC as required by SSR 02-lp. Second, the claimant alleges that the Commissioner's decision should be reversed because the ALJ failed to include the required "function-by-function" assessment.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because

they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).  Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

Under Social Security Regulation 02-1p,  the ALJ must consider obesity along with his other determinations. SSR 02-1p. Because no listing for obesity exists, the regulations state that "'we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if an impairment that, in combination with obesity, meets the requirements of a listing....'" *Lewis v. Comm'r of Soc. Sec.*, 487 F. App'x 481, 483 (11th Cir. 2012).

Medical Listing §1.02 (Major dysfunction of a joint(s)) states:

> §1.02 is characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), with: (a) involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or (b) involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Social Security Ruling 96–8p provides guidance regarding RFC assessments:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of

4

exertional levels. *See Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir.2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir.2007); *see also Bailey v. Astrue,* 5:11–CV–3583–LSC, 2013 WL 531075 (N.D.Ala. Feb. 11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96–8p at *4–*5. However, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to show that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel,* 355 F. App'x at 263.

The ALJ must clearly articulate the weight he affords to each item of evidence and the reasons for the decision so that the reviewing court can determine whether his ultimate decision is based upon substantial evidence.  *Cowart v.  Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981).

In making a claim for disability benefits, the claimant bears the initial burden of establishing the existence of a disability and is responsible for producing evidence in support of her claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The social security regulations place a very heavy burden on the claimant to demonstrate the inability to perform past relevant work. *Moore*, 405 F.3d at 1211.

## V. FACTS

The claimant was sixty years old at the time of the administrative hearing and is a high school graduate. The claimant has previous work experience as a hospital cleaner. (R. 59). According to the claimant, she was fired from her last job in 2008. At her hearing, the claimant amended her onset date to August 1, 2009 because that was the time that she alleged her pain began. (R. 42).

*Physical Impairments*

The record contains medical records from the claimant's primary physician, Dr. Julene Pearson, beginning on January 28, 2009. On this date, Dr. Pearson determined that the claimant suffered from benign essential hypertension, which was inadequately controlled because of the claimant's non-compliance with her medicine. Also, Dr. Pearson stated that the claimant suffered from esophageal reflux, hyperlipidemia, post-surgical primary hypothyroidism and depression "which is resolved." At this visit, Dr. Pearson counseled the claimant on the proper use of medications, proper diet, and the need to exercise more. (R. 248-250).

On February 11, 2009, the claimant reported to Dr. Pearson for a follow-up appointment and had no complaints. On April 16, 2009, the claimant went to Dr. Pearson for her annual visit. Dr. Pearson stated again that the claimant suffered from benign essential hypertension, esophageal reflux that was well-controlled, hyperlipidemia, and post-surgical primary hypothyroidism. The doctor also stated that the claimant suffered from obesity and pre-diabetes. (R. 229-247). The claimant returned for follow-up visits with Dr. Pearson two more times in 2009, and six more times in 2010. (R. 184-228). In 2011, the claimant had three follow-up visits to renew prescriptions before she switched physicians.

Dr. Pearson referred the claimant to Dr. Steven Sokell, doctor of podiatry, after the claimant complained of left and right foot pain. She saw Dr. Sokell on August 11, 2009. Dr. Sokell stated that the claimant had capsulitis of the 3ʳᵈ MPJ of her right foot and pain on the dorsum of her left foot, with unknown cause. Dr. Sokell stated that he planned to obtain a nerve conduction study. He also ordered the claimant to wear an ankle strapping with arch and metatarsal pad to give her foot extra support. He also gave the claimant an arthrocentesis injection of dexamethasone and Marcaine plain. (R. 183).

On August 12, 2010, the claimant received x-rays from the department of radiology at Cooper Green Hospital. The x-rays indicated that the claimant's lumbar spine was normal and that her vertebral bodies and interspaces were well-maintained in height. The tests also showed mild osteoarthritic changes in the lower portion of her lumbar spine, but the sacroiliac joints were normal and no structural defects were present. (R. 257).

On August 17, 2010, the claimant saw Dr. Ashley Thomas upon the request of the Disability Determination Service. Dr. Thomas stated that the claimant's chief complaints were her right arm pain and her bilateral leg pain. The claimant reported that her pain was typically a 10/10 in severity, with pain at a 4/10 on her best days and greater than 10/10 on her worst days. She stated that the arm pain was aggravated by prolonged activity, lifting and squeezing. She stated that her leg pain was aggravated by standing and walking and that the pain was alleviated by pain medication and elevating her legs. She also complained of numbness, cramping of toes, and the swelling of her ankles.

Dr. Thomas then analyzed the impact of the claimant's pain on her activities of daily living. Dr. Thomas stated that the claimant remained "independent and can ambulate on her own." Dr.

Thomas also said that the claimant gave a very poor effort throughout the examination. The claimant refused to perform heel, toe and tandem gait tests, as well as heel-to-knee, squatting and bending over. Dr. Thomas stated that the claimant used a wheelchair and cane as assistive devices, but neither were prescribed by a doctor and that the claimant did not have either device at the examination with Dr. Thomas.

Dr. Thomas noted that the claimant's medical records did not explain the etiology of her chief complaints. Dr. Thomas described the claimant's residual capacity functional assessment as follows: the claimant could stand and walk for one hour during an eight hour day with frequent breaks; she could sit for two hours with frequent breaks; an assistive device would be helpful for long distances; the claimant should avoid lifting to prevent exacerbation of arm pain; all postural limitations apply; no manipulative or environmental limitations apply. (R. 258-262).

On September 17, 2010, C.V. Brewington and Dr. Stuart Stephenson performed physical summaries for the Disability Determination Service. Dr. Stephenson concluded that the medical source opinion of the consultative examiner, Dr. Ashley Thomas, was not supported by her own exam and should be given little weight. (R. 225-256).

On November 17, 2011, the claimant went to Simon Williamson Clinic, P.C., and saw Dr. Juan Johnson. The claimant told Dr. Johnson that she had left Dr. Pearson at the Chris McNair Clinic because Dr. Pearson would not listen to her. At her initial visit, Dr. Johnson noted that the claimant reported symptoms consistent with fairly significant depression, which included crying, increased somnolence, feelings of being down in the dumps and lack of hedonism. Dr. Johnson stated that the claimant's current problems included a depressive disorder, goiter, hypertension, hypokalemia, and hypothyroidism. (R. 324-325).

8

On January 12, 2012, the claimant saw Dr. Johnson and complained of insomnia and paresthesias in her right hand. Dr. Johnson prescribed Klonopin and ordered a nerve conduction test and a sleep test. (R. 330).

The claimant had a follow-up visit with Dr. Johnson on March 12, 2012. She told the doctor that she had been unable to afford the deductible for the nerve conduction test and the sleep test. She also stated that she had not been taking the prescribed Klonopin because she read the side effects and it made her nervous. At this appointment, she complained of insomnia and right-hand numbness. She also stated that her feet tingle and her right leg is in pain and that she had discontinued the use of another of her prescription drugs, clonidine. Dr. Johnson counseled the patient on the side-effects of Klonopin and relieved her concerns. Dr. Johnson continued the claimant on sertraline, which she stated had helped her depression. Dr. Johnson also continued treating the claimant's hypothyroidism and hypertension with medication. (R. 330-331).

### Mental Impairments

On August 24, 2010, Dr. William Beidleman, a licensed psychologist, examined the claimant on behalf of the Disability Determination Service. When asked about whether she had any mental or psychological problems, the claimant responded "no sir." The claimant also reported that she has trouble complying with her prescriptions, because she "just forgets." At this evaluation, the claimant stated that she had never taken psychiatric medication in the past.

When asked about friends and activities, the claimant stated that she "don't fool with peoples, can't get along, people messy." She also stated that she was fired from her last job in 2008, when she had a misunderstanding with the lead person. When asked why she did not return to work, the claimant stated that she got sick and then had her thyroid taken out. She stated that she could no

longer work now because she is not able to do long walks or stand up, and she has pain in her right, ankle, knees and calves.

The claimant stated that she has never had a driver's license, and Dr. Beidleman noted that she did not appear overtly anxious, depressed, psychotic or manic. Dr. Beidleman asked the claimant three different times about whether she had any serious mental or emotional problems and she denied having any problems all three times. Dr. Beidleman stated that the claimant's concentration and attention were only fair and that she was distractable. He also said she counted backwards from twenty with multiple omissions. She was able to spell the word "world" forwards but not backwards; she could not perform simple financial transactions, such as multiplying six packs of gum costing twenty-five cents; she repeated six digits forwards, but only two backwards; her recent and remote memory were only fair; and she was quite vague in remembering treatment details.

The claimant told Dr. Beidleman that her daily activities included watching TV, talking to her daughter-in-law, making salad, sitting with her daughter-in-law's baby if she went out, and going to church every Sunday, although she stated she had not been since June.

Dr. Beidleman emphasized the claimant's physical difficulties over her psychiatric complications. Dr. Beidleman stated that the claimant was not taking psychoactive medications and had not been treated by a mental health professional in approximately forty years. Dr. Beidleman said that the claimant merited a diagnosis on axis I or axis II. He stated that she does have a history of questionable compliance with her medication regimen and describes herself as nervous sometimes. The doctor stated that the claimant's current GAF score was 61 and that she was able to function independently, but that she did see herself as quite debilitated. Dr. Beidleman stated that the claimant could have difficulty remembering complex job instructions. Dr. Beidleman also said that the

claimant's motivation and cooperation with the examination process were adequate for valid results. (R. 252-254).

On October 1, 2010, Dr. Robert Estock performed a Psychiatric Review Technique. Dr. Estock found that the claimant had no medically determinable impairment. Dr. Estock reviewed the examination records of Dr. Biedleman. Dr. Estock determined that the claimant had no mental allegations; however, her activities of daily living indicated difficult with memory, completing tasks, concentration, understanding, following instructions and getting along with others. Dr. Estock pointed out the facts that the claimant completed twelve years of unassisted education and has a previous history of unskilled work. Dr. Estock also found that claimant had no diagnosis of a mental impairment in the medical records and that she was not on psychotrophic medications. From Dr. Biedleman's examination records and the other facts, Dr. Estock found that the claimant did not have a medically determinable mental impairment. (R. 263-275).

*ALJ Hearing*

The claimant and her attorney attended a video conference hearing on May 22, 2012.  At the beginning of the hearing, the claimant amended her onset date of February 15, 2008 to August 11, 2009. The claimant amended her onset date because August 1, 2009 was when the medical records reflect that the claimant began to complain about her impairments.

The claimant testified that she suffers from chronic pain, numbness, weakness in her lower extremities, and back pain. The claimant also stated that medical evidence reveals degenerative disc disease of her lumbar spine. She testified that she has hypertension, obesity and insomnia. She said that she has had some parethesias of the hands that has gotten worse in her right hand and that her

depression had increased over the past year. The claimant testified that her biggest problem is her back pain. (R. 42-44).

The claimant discussed her previous job as a hospital worker, and stated that her back pain made it difficult for her to bend over and make the beds. She also stated that, because of her back pain, she is unable to go to church.

The claimant also stated that she suffers from numbness in her feet every night. She said that the doctors have not been able to diagnose this because she cannot afford the deductibles for these tests. She complained that her ankle swells and gives her great pain, making it hard for her to stand. The claimant testified that her pain comes and goes. She said that walking aggravates the pain, and that her pain is usually a 6/10 on an average day. She also said that she can only stand for five minutes before she has to take a break and sit down. She testified that she can walk about half a block before she needs to take a break. The claimant also testified that she can lift a gallon of milk. (R. 44, 49, 50).

The claimant then stated that sometimes her pain is so bad she is unable to sleep at night. The ALJ pointed out that the claimant's doctor was prescribing medicine to help her sleep, and the claimant responded that it helps some. She testified that on the medication she sleeps five to six hours a night. The claimant also testified that she sleeps a lot during the day because of all the medications she is prescribed, which make her sleepy. She also stated that she felt that the medications for her high blood pressure and depression do not help very much. She stated that, regarding her depression, she still feels like she wants to cry a lot and has a burden on her that she cannot get off. (R. 49-50).

The claimant testified that she was fired from her last job because of conflict with her co-

12

workers. She said that she was having mental health symptoms while she was working. The claimant alleged that she is nervous all the time and if people say something to her she wants to cry all the time. She testified that the symptoms had been going on for a year and a half. At this point in the hearing, the claimant stated that her depression medication, setraline, did help with her mental symptoms. (R. 52-53).

The claimant stated that she had never had a driver's license, but was able to use public transportation while accompanied by someone. She testified that she could not go alone because she was unable to get up into the buses without assistance. The claimant testified that she lived with her god-daughter.

The ALJ then examined Melissa Brassfield, a vocational expert. The vocational expert considered the claimant's past work history as a cleaner at a hospital. The claimant testified that at that job she was required to move the beds on wheels from room to room and make beds. The vocational expert defined the claimant's past work as medium unskilled work. (R. 59).

The ALJ presented the vocational expert with a hypothetical to consider the type of work the claimant could perform. The first hypothetical asked the vocational expert to consider an individual, capable of performing medium work, who could never climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs. Also, the individual could occasionally stoop, kneel, crouch, crawl and engage in activities requiring balance. This individual would be limited to simple, routine and repetitive tasks that require only occasional interaction with the public and only occasional interaction with coworkers. With the hypothetical in mind, the vocational expert stated that the claimant's past relevant work as a hospital cleaner would not be available. (R. 59).

The vocational expert then testified that while the hypothetical individual would be unable

13

to perform work as a hospital housekeeper, the individual could perform work at the medium level of exertion as a hand packager, a laundry worker, or a poultry hanger. The vocational expert also testified that those jobs were available in the national and state economy.  (R. 60).

The ALJ then presented a second hypothetical that assumed the same non-exertional limitations as the first hypothetical; however, this hypothetical was limited to light work. The second hypothetical individual would require the use of a cane for ambulation.[1] The vocational expert stated that no jobs in the national or state economy existed for this hypothetical. The vocational expert and the ALJ discussed the claimant's cane, but the record is unclear about whether they determined this to be a limitation on her ability to work.[2] (R. 60-61).

*ALJ Opinion*

The ALJ denied the claimant disability benefits on August 2, 2012. In his opinion, the ALJ first found that the claimant met the insured status requirements of the Social Security Act through September 30, 2013. The ALJ also determined that the claimant had not been engaged in substantial gainful activity since August 2, 2009, the amended onset date. (R. 24).

The ALJ then determined that the claimant had severe impairments of degenerative disc disease, obesity, hypertension and depression. The ALJ stated that other impairments appeared in the record without evidence that they are severe, including: gastroesophageal reflux disease (GERD), hypothyroidism, hyperlipidemia, diabetes mellitus, hepatitis B, hematemesis, pseudohyponatremia, hypokalemia, hypochloremia, insomnia, diverticulitis, and hemorrhoids. These impairments were unaccompanied by evidence that any of them are a source of persistent, material limitations, and

---

[1] The hypothetical also included another limitation that was recorded as "[inaudible]" in the hearing record.

[2] Again, the record of the hearing states "[inaudible]" for the vocational expert's testimony.

14

when symptoms of these impairments are mentioned, the record usually stated that they were "well-controlled" by medication. The claimant also complained of conditions such as swelling in her joints and a "knot in her arm" that did not appear to have any associated diagnoses from one or more acceptable medical sources but were only established by the claimant's statement of symptoms. They cannot, therefore, be considered severe impairments.

The ALJ then determined that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. The ALJ considered Medical Listings §§1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 4.04 (ischemic heart disease), and 12.04 (affective disorders).

Regarding §1.02, the ALJ stated that this listing requires demonstrating gross anatomical deformity and chronic joint pain and stiffness, with signs of limitation of motion or other abnormal motion of the affected joint(s), as well as findings, on appropriate medically acceptable imaging, of joint space narrowing, bony destruction, or ankylosis of the affected joint. The listing also requires involvement of one peripheral joint resulting in an inability to perform fine and gross movements effectively as defined by §1.00B2c and/or an inability to ambulate effectively as defined by in §1.00B2b. The ALJ stated that the claimant's medical evidence did not demonstrate that she had sufficient difficulty in performing fine and gross movements or sufficient difficulty in ambulating.

The ALJ stated that the claimant's mental impairment did not meet or medically equal the criteria of listing §12.04. The ALJ also determined that the claimant did not satisfy "paragraph B" criteria. The ALJ said that the weight of the evidence indicated that the claimant had mild restrictions in activities of daily living, mild restrictions in social functioning, and moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation. The ALJ discussed the State

consultant's review of the records. At the time of his review, Dr. Robert Estock concluded that no evidence of a medically determinable mental impairment existed, due in part to a largely benign consultative examination and the general lack of an extensive treatment history for psychological symptoms. The ALJ stated that, while Dr. Estock's opinion was likely credible at the time it was made, the claimant had been prescribed medication to treat her depression since that time. The ALJ stated that he gave the claimant the benefit of the doubt in view of her partially credible testimony at the hearing, and gave Dr. Estock's opinion little weight because of this subsequent treatment.

The ALJ then determined that the claimant had the residual functional capacity to perform medium work, except that she can never climb ladders, ropes or scaffolds, and can only occasionally climb ramps or stairs, and occasionally stoop, kneel, crouch, crawl, or engage in activities requiring balance. Her work would need to be limited to simple, routine, and repetitive tasks requiring only occasional interaction with the public and only occasional interaction with coworkers. (R. 27).

The ALJ stated that, while the record contained objective evidence of functionally limiting impairments, many of the claimant's allegations were not corroborated by the record. The ALJ pointed out that the claimant's statements concerning her impairments and their impact on her ability to work were not fully credible in light of her available medical history, reports from treating and examining medical professions, the degree of medical treatment required to manage the claimant's impairments, and the evidence of the claimant's abilities with respect to her activities and overall lifestyle. The ALJ went on to say that the objective medical evidence did not establish that the symptoms of the claimant's physical impairments would prevent the performance of work consistent with the above residual functional capacity during the claimant's alleged period of disability. (R. 28).

The ALJ commented on the disconnect between the claimant's alleged limitations and those

supported by the record. The ALJ said that the claimant "offered an implausibly severe set of limitations, include [sic] stating that she has vision, speech and hearing problems (adding, without explanation, that she 'just don't [know] how to do those things'), alleged that she is unable to take more than 'two or three steps' before needing to stop and rest, and, despite apparently completing a Function Report by hand, stating that she has no ability to follow written instructions." (R. 28).

The ALJ looked at three doctors' appointments, all in different years. The ALJ stated that on a May 2010 examination by Dr. Pearson, the claimant stated that she was "feeling fine" with no complaints, and did not demonstrate any musculoskeletal or psychological symptoms. In November 2011, Dr. Juan Johnson stated in his patient evaluation that the claimant's systems were "essentially unremarkable" apart from her depression and that she was alert and oriented, in no acute distress, and displayed a full range of motion in her extremities. At a follow-up appointment in March 2012, Dr. Johnson noted that the claimant, who is right hand dominant, complained of insomnia and right hand numbness "after she goes to bed." Dr. Johnson stated that other than these complaints, the claimant appeared in no acute distress and demonstrated no neurological deficits in strength or sensation in all four extremities. The ALJ considered all of this evidence in analyzing the credibility of the claimant's complaints. (R. 28).

When considering Dr. Thomas's opinion, the ALJ noted that Dr. Thomas's examination of the claimant's spine was essentially normal, with only mild degenerative changes, that claimant's straight-leg test was negative, that no evidence indicated that her alleged use of a wheelchair and cane had been prescribed as medically necessary, and Dr. Thomas described her as independent in her activities of daily living and ambulation, cooperative, and appeared comfortable. Dr. Thomas stated that the claimant gave a very poor effort throughout the examination and that the medical

records do not explain the etiology of her chief complaint. (R. 28-29). The ALJ gave little weight to Dr. Thomas's medical opinion. The ALJ pointed out that the claimant was fired from her job in 2008, and was not forced to quit working because of her physical limitations. For these reasons, the ALJ stated that Dr. Thomas's opinions were against the weight of the objective evidence, which indicated that the claimant was capable of performing work consistent with the residual functional capacity assessment. (R. 31).

The ALJ also looked at Dr. Stuart Stephenson's review of the record. Dr. Stephenson concluded, based on the claimant's "minimal" degenerative disc disease, "borderline" diabetes and opinion of Dr. Ashley Thomas that the claimant's physical impairments were not severe. The ALJ stated that Dr. Stephenson is an acceptable medical source and the record is thin, with an abundance of allegations that are unaccompanied by medical records to explain their etiology. The ALJ further noted that no credible evidence supported the allegations of material vision, speech or hearing limitations, significant manual dexterity problems, an ambulatory ceiling of two to three steps, or the statement that the claimant's pain is rated at 10/10.

The ALJ gave the claimant the benefit of the doubt, recognizing that x-rays did show that she had degenerative changes in her spine and that she was obese, which could account for some limitations. The ALJ stated that he gave Dr. Stephenson's opinion little weight. Because the ALJ found that the claimant's complaints as to these symptoms could be plausible, he provided for these limitations in the residual functional capacity assessment. (R. 29).

The ALJ also stated that the objective medical evidence did not establish that the claimant's mental impairments were as severe as alleged. The ALJ concluded that the evidence did not indicate that the claimant's impairments would prevent the performance of work consistent with the residual

functional capacity assessment. The ALJ noted that the claimant's mental health treatment history was negligible. The ALJ pointed to the claimant's repeated comments to Dr. Beidleman that she had not suffered from any mental health or psychological problems. The ALJ looked at evidence that the claimant was prescribed psychological medication in October 2010, that she felt like the medication was improving her symptoms at a March 2011 appointment, and that the claimant was suffering from fairly significant depression in November 2011. Other than the evidence discussed, the record was devoid of any other mental health allegations that would support any especially severe mental limitations. (R. 29-30).

The ALJ also pointed out that Dr. Robert Estock reviewed the bulk of the record. Dr. Estock concluded that the evidence did not indicate a medically determinable mental impairment. The ALJ stated that while this opinion was defensible at the time it was made, the claimant did have a diagnosis of depression from an acceptable medical source, despite the general absence of material functional limitations. The ALJ stated that he gave the claimant the benefit of the doubt, and limited her to simple, routine, repetitive tasks requiring only occasional interaction with the public and only occasional interaction with coworkers. (R. 30).

The ALJ gave little weight to the statements of the claimant. (R. 30). The ALJ stated that the claimant's statements were not particularly credible because, while the claimant stated that she can only walk two or three steps and was limited in her ability to perform virtually every physical and mental activity, she always appeared alert and oriented at largely benign medical visits, without evidence that she needed an assistive device to maintain gait and station.

The ALJ also discredited the claimant's allegations that her pain was "typically a 10/10 in severity." The ALJ stated that the National Institute of Health Pain Consortium indicates that pain

from a 7 to a 10 represent "severe" pain, which is defined as disabling, and renders a person unable to perform activities of daily living. The ALJ stated that the claimant's alleged pain levels are at odds with the record, which generally indicates that the claimant is functional with respect to her activities of daily living. The ALJ pointed at that the claimant prepares simple meals, occasionally cares for a young child, can care for her own personal needs, uses public transportation, and typically appears in no acute distress at her medical visits. The ALJ also commented that the claimant had often been described as non-compliant with her medications, which further undermined her credibility. In sum, the ALJ stated that the record simply did not indicate that the claimant's symptoms are as functionally limiting as alleged. (R. 30-31).

The ALJ gave moderate weight to the consultative examiner, licensed psychologist, Dr. William Beidleman. Dr. Beidleman determined that the claimant was generally mildly limited and should be able to function independently, although she could have difficulty remember complex job instructions. The claimant also alleged at the hearing that she had problems with irritability. Because of Dr. Beidleman's opinion, and giving the claimant the benefit of the doubt, the ALJ incorporated social limitations into the residual functional capacity assessment. (R. 31).

The ALJ then found that the claimant would be unable to perform her past relevant work as a hospital cleaner, given the limitations in her residual functional capacity assessment. The ALJ noted that the claimant was approaching retirement age, had at least a high school education and was able to communicate in English. The ALJ found that transferability of job skills was not an issue in this case because the claimant's past relevant work was unskilled. From this information, the ALJ determined that considering the claimant's age, education, work experience and residual functional capacity, the claimant would be able to perform jobs in the national economy, such as a Packager

20

(DOT 920.587-018), Laundry Worker I (DOT 361.684-014), and Poultry Hanger (DOT 525.687-022). (R. 32).

## V. DISCUSSION

### A. Whether the Commissioner's decision should be reversed because the ALJ failed to discuss the claimant's obesity and right ankle arthritis in developing her residual functional capacity as required by SSR 02-lp.

The ALJ properly considered the medical evidence regarding the claimant's obesity and right ankle arthritis while evaluating the claimant's residual functional capacity. Because substantial evidence supports the ALJ's finding, this court finds that the ALJ's determination was proper.

Social Security Regulation 02-1p requires the ALJ to consider obesity along with determining whether (1) a claimant has a medically determinable impairment, (2) the impairment is severe, (3) the impairment meets or equals the requirements of a listed impairment, and (4) the impairment bars claimant "from doing past relevant work and other work that exists in significant numbers in the national economy." SSR 02-1p.

In the present case, the claimant alleges that the ALJ failed to discuss the claimant's obesity and right ankle arthritis in developing her residual functional capacity. However, the ALJ found that the claimant's obesity was a severe impairment, and the ALJ took the collateral effect of the claimant's obesity into account when considering whether the claimant had any severe impairments that met the listing.

The ALJ found that the claimant's right ankle arthritis did not meet §1.02 because the evidence did not demonstrate that the claimant had sufficient difficulty in performing fine and gross movements or sufficient difficulty ambulating. The claimant states as evidence in support of her right ankle arthritis that she complained of right ankle and foot pain on multiple occasions. The claimant

21

points to her visits with Dr. Sorkell, Dr. Thomas, and Dr. Pearson as evidence that her arthritis, in combination with her obesity, is severe.

The ALJ gave little weight to Dr. Thomas's medical opinion and agreed with the State agency consultant, Dr. Stuart Stephenson, who concluded that Dr. Thomas's opinion was not supported by her own exam and that the claimant's physical impairments were not severe. (R. 29). The ALJ also stated that the claimant's objective physical examinations were benign and that she was fired from a position in 2008 that was performed at a medium exertional level without significant objective medical evidence of a material decline in her physical condition. The ALJ stated that Dr. Thomas's opinions are against the weight of the objective evidence, which indicated that claimant is capable of performing work consistent with the residual functional capacity.

From the conservative course of treatment from Dr. Pearson, the lack of medical evidence to support Dr. Thomas's opinion, and the lack of any diagnosis in Dr. Sokell's records, the ALJ had substantial evidence in finding that the claimant's right ankle arthritis was not a severe impairment.

The claimant then alleges that her obesity exacerbated the symptoms of her right ankle arthritis. The claimant stated that the ALJ did not consider the claimant's obesity when formulating the residual functional capacity. Because no listing for obesity exists, the ALJ must find that a claimant with obesity "meets" the requirement of a listing if she has another impairment that, by itself, meets the requirements of a listing. The ALJ may also find that a listing is met if an impairment that, in combination with obesity, meets the requirements of the listing. The claimant's right ankle arthritis does not meet listing §1.02 on its own, and this court finds that substantial evidence supports the ALJ's finding that the claimant's right ankle arthritis, in combination with her obesity, did not meet listing §1.02 or any other listing.

Also, the ALJ stated that "[t]here is no medical evidence of... an ambulatory ceiling of two to three steps, or, given the endless parade of medical notes stat[ing] that the claimant does not appear in acute distress during her visits, routine 10/10 pain." (R. 29).  The claimant has the burden to establish the existence of a disability, present evidence to support this disability, and present evidence to support the inability to perform past relevant work. This court finds that the claimant failed to meet this burden to establish that her right ankle arthritis, in combination with her obesity, was a disabling impairment. Not only did the ALJ have substantial evidence to find that the claimant's arthritis and obesity did not meet a listing, but the ALJ also sufficiently stated the reasons for this finding.

**B. Whether the Commissioner's decision should be reversed because the ALJ failed to include the required "function-by-function" assessment.**

The claimant argues that the ALJ failed to include a function-by-function assessment, which she alleges is reversible error. This court finds that the ALJ properly assessed the residual functional capacity and affirms the ALJ's decision.

SSR 96-8p requires the ALJ to identify the individual's functional limitations or restrictions and assess the individual's work related abilities when formulating a residual functional capacity. The ALJ can satisfy this requirement if he discusses the individual's medical record, while also citing a regulation that defines the exertional demands of the claimant's residual functional capacity. *See Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009); *Freeman v. Barnhart*, 220 F. App'x 957, 959-9560 (11th Cir. 2007).

The ALJ determined that claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that she can never climb ladders, ropes or scaffolds, only occasionally climb ramps or stairs, and occasionally stoop, kneel, crouch,

23

crawl, or engage in activities requiring balance. Her work is limited to simple, routine, and repetitive tasks requiring only occasional interaction with the public and only occasional interaction with coworkers. (R. 27).  After determining the claimant's residual functional capacity, the ALJ stated that he considered all symptoms and the extent to which these symptoms could be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529, 20 CFR 416.929, SSR 96-4p, and SSR 96-7p. The ALJ also considered the opinion evidence found in the record. (R. 27).  While the ALJ must consider the claimant's medical condition as a whole, the ALJ is not required to refer to every specific piece of evidence that was evaluated in making a decision. The ALJ is not obligated to discuss the claimant's ability to perform the specific exertional demands that he determined in the residual functional capacity. *Castel*, 355 F. App'x at 263; *Freeman*, 220 F. App'x at 959-960. *See Williams v. Astrue*, CV-2782-KOB, 2012 WL 4329301 (N.D. Ala. Sept. 19, 2012).

While the claimant did allege a number of impairments, symptoms and pain that would prevent her from performing jobs within the residual functional capacity, the ALJ stated that the claimant's allegations were not particularly credible.  The burden is on the claimant to establish the existence of a disability, and she is responsible for presenting evidence to support her claim. *Ellison*, 355 F.3d at 1276. The social security regulations place a high burden on the claimant to establish the inability to perform past relevant work. *Moore*, 405 F.3d at 1211.

The ALJ also points to the fact that the claimant was fired from her last job, which was performed at a medium skill level and that no subsequent objective medical evidence exists that illustrates a material decline in the claimant's physical condition. The ALJ also stated that while factors such as "age, natural body build, and the activities [a claimant] was accustomed to doing in

24

his or her previous work" may correlate with functionally limiting impairments, they are not, in themselves, prima facie evidence of any particular sort of limitation. SSR 96-8p. From this evidence, the ALJ found that the record does not indicate that the claimant's symptoms are as functionally limiting as alleged.

The claimant also alleges that the ALJ did not consider the claimant's degenerative disc disease, back and leg pain, and use of a cane when formulating her residual functional capacity. Regarding the claimant's degenerative disc disease, the ALJ stated while x-rays do reveal some degenerative changes in her spine, the residual functional capacity limits the claimant to never being able to climb ladders, ropes or scaffolds, and the claimant can only occasionally stoop, kneel, crouch, crawl, or engage in activities requiring balance.

Also, Dr. Pearson and Dr. Johnson were treating physicians of the claimant at different times during her treatment. Neither doctor ever prescribed the claimant pain medicine stronger than Tylenol, and both conservatively treated her myriad of complaints. The objective medical evidence from the claimant's treating physicians does not indicate any severe pain or inability to perform requirements in a work environment.

Dr. Thomas stated that an assistive device could be useful to the claimant for "long distances." Again, the ALJ found that this opinion is not in line with the objective medical evidence of record. Neither of the claimant's treating physicians determined that the claimant needed an assistive device to ambulate. The ALJ also pointed out that the claimant displayed a full range of motion in her extremities at a November 2011 appointment, and demonstrated no neurological deficits in strength or sensation in all four extremities in March 2012.

Regarding her depression, the ALJ gave the claimant the benefit of the doubt and

incorporated social limitations into the residual functional capacity. The ALJ gave weight to Dr. Beidleman's opinion that the claimant might have difficulty remembering complex instructions. The ALJ also considered the claimant's testimony that she has problems with irritability.

The ALJ is not required to discuss every exertional demand when formulating the claimant's residual functional capacity. Also, the ALJ is not required to point to every piece of medical evidence used to make his determination. Further, the claimant has the burden to establish the existence of a disability, present evidence to support this disability and the inability to perform past relevant work. The ALJ commented that the medical record was thin, with an abundance of allegations that are unaccompanied by medical records that explain their etiology.

For the above stated reasons, this court finds that the ALJ did not fail to employ a function-by-function assessment when determining the claimant's residual functional capacity, and substantial evidence supports the ALJ's finding.

## VI. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 17th day of February, 2015.

_KARON OWEN BOWDRE_
CHIEF UNITED STATES DISTRICT JUDGE